Community Savings and Loan Company v. Commissioner.
Community Sav. & Loan Co. v. Commissioner
Docket No. 62204.
United States Tax Court
T.C. Memo 1959-23; 1959 Tax Ct. Memo LEXIS 225; 18 T.C.M. (CCH) 109; T.C.M. (RIA) 59023; February 10, 1959
*225 Robert P. Smith, Esq., Bowen Building, Washington, D.C., and Dorothea Baker, Esq., for the petitioner. V. R. Balmes, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income tax of the petitioner for the taxable years 1952 and 1953 in the respective amounts of $9,826.60 and $16,083.23. Petitioner claims an overpayment. The issues are: (1) Whether petitioner overstated its earned interest income on its income tax returns filed for the taxable years 1952 and 1953, and if so, in what amounts. (2) Whether the liabilities of the petitioner, evidenced by alleged certificates of indebtedness, qualify as borrowed capital for the purpose of computing excess profits tax credit. (3) Whether respondent properly disallowed the amounts of $3,805.22 and $1,519.75 as deductions for depreciation for the years 1952 and 1953, respectively. (4) Whether respondent properly reduced the amounts added by petitioner to its reserve for bad debts for each of the taxable years 1952 and 1953. Findings of Fact Petitioner is a corporation organized in 1917 under the Industrial Loan Laws of the State of West Virginia, *226 having its principal office at Parkersburg, West Virginia. It filed its returns for the periods involved with the district director of internal revenue at Parkersburg, West Virginia. Petitioner is engaged in the business of furnishing consumer credit on an installment basis to customers acquiring commodities, such as automobiles, refrigerators, washers, and other household utilities. Prior to the repeal in May 1952, of Regulation W of the Federal Reserve Board, petitioner was restricted in furnishing credit on an installment basis to periods of not more than 15 months. After the repeal petitioner was able to furnish credit for unlimited terms and it made loans for various periods ranging up to 36 months. When petitioner made loans during the years 1952 and 1953, the entire amounts of interest to be collected were credited to interest income. At the end of each year it segregated unearned income by setting up an unearned interest reserve account. The unearned income was reflected as taxable income in subsequent years as it became earned. In its returns for the years ending December 31, 1952, and 1953, petitioner reported the respective amounts of $199,981.08 and $211,197.14 as *227 unearned income. The unearned income was determined on a percentage basis used in prior years and without actual audit. In 1954, an audit of the ledger cards maintained on each loan disclosed that the unearned interest reserve had been understated at the close of the taxable years 1952 and 1953. Thereupon petitioner made an audit of its ledger cards and prepared a summary of outstanding loans at the close of each of the years 1952 and 1953. The summaries offered in evidence for each such year set forth the date of the loan, the name of the borrower, the amount of interest charged, the term of the loan in number of months, the number of months remaining at the close of the year, and the unearned interest at the close of each year pertaining to each loan. Adjusting journal entries were made for the years 1952 and 1953, as follows: 1952
Correct unearned interest as per
audit 12/31/52
$268,774.98
Unearned int. as shown on ledger
12/31/52
199,981.08
Interest income overstated
$ 68,793.76
1953
Correct unearned interest as per
audit 12/31/53
$305,129.66
Unearned int. as shown on ledger
12/31/53
211,197.14
Interest income overstated for
12/31/52 and 12/31/53
$ 93,932.52
Less: Amount applicable to year
1952
68,793.76
Interest income overstated for year
1953
$ 25,138.76
*228 Petitioner overstated its interest income from the taxable years 1952 and 1953 by the respective amounts of $68,793.76 and $25,138.76. During the taxable years 1952 and 1953, petitioner accepted funds from the public on which it paid interest. Upon receipt of the funds petitioner issued a booklet containing the following printed matter: "No. "CERTIFICATE OF INDEBTEDNESS "Community Savings & Loan Co. "Parkersburg, West Virginia
"hereinafter called the 'Company' acknowledges itself to be indebted to "(Name) "(Address) "hereinafter called 'Creditor,' for the amount of balance shown by books of the Company and the account set forth in this book, and promises to pay the same in the manner and under conditions as follows: "The Company will pay creditor any part of such balance upon demand and presentation of this book for entry of such payment, after ninety (90) days' notice of intention to demand such payment, and will pay entire balance, with interest at the rate of… per cent per annum, upon demand and surrender of this certificate and book, after like ninety (90) days' notice, unless in either event such notice be waived by the Company. "Upon any balance owing *229 on June 30th and December 31st, of each year, the Company will pay interest at the rate of… per cent per annum, or will add same to balance owing, as creditor may elect. "The payments herein agreed to be made shall be made at the offices of the Company, Parkersburg, West Virginia, and said Company shall have the right to pay the indebtedness evidenced hereby at any time, after giving to the creditor thirty (30) days' written notice, addressed to said creditor at his or her last known address, of an intention so to do, and interest thereon shall cease on the date for payment named in such notice. "IN TESTIMONY WHEREOF, said Company has caused this certificate to be signed by an officer duly authorized. "COMMUNITY SAVINGS & LOAN COMPANY "By " In addition to the above printed matter the booklet contains 18 blank pages with the following headings: Date Initials Debit Credit Balance Petitioner's outstanding liability with respect to the so-called certificates of indebtedness at the end of December 31, 1952 and 1953 was as follows: 1952
$1,255,899.22
1953
1,320,517.31
In the deficiency notice the respondent determined that the amounts represented by the *230 so-called certificates of indebtedness issued and outstanding for the taxable years ended December 31, 1952 and 1953, do not constitute borrowed capital within the meaning of section 439(b) of the Internal Revenue Code of 1939. Respondent also determined that the petitioner's adjusted invested capital and its excess profits tax credit at the beginning of each of the taxable years 1952 and 1953 was as follows: 1952
1953
Equity invested capi-
tal
$1,296,629.05
$1,337,613.07
Excess profits tax
credit
189,462.42
206,864.39
On its returns for the taxable years 1952 and 1953, petitioner claimed depreciation on its buildings and physical equipment in the respective amounts of $6,251.06 and $3,484.32. The respondent disallowed the amount of $3,805.22 in 1952, and the amount of $1,519.75 in 1953. In schedules attached to the returns for the taxable years 1952 and 1953, petitioner computed the depreciation as follows: Date
Claimed Depreciation
Asset
Acquired
Cost
Life
1952
1953
Building
1924-1929
$20,460.00
33 1/3 yrs.
$ 613.80
$ 613.80
Furniture & fixtures
various
29,201.86
10 yrs.
2,920.19
1,074.27
Same
1950
3,733.02
10 yrs.
373.30
373.30
Same
1951
1,827.90
10 yrs.
182.79
182.79
Same
1952
941.98
10 yrs.
47.10
94.20
Same
1953
1,866.67
10 yrs.
93.33
Automobiles (subject to hard usage)
1950
2,737.19
2 yrs.
1,368.59
Same
1951
990.58
2 yrs.
495.29
330.19
Same
1953
1,889.74
2 yrs.
472.44
Frame Building (old)
1950
5,000.00
20 yrs.
250.00
250.00
$6,251.06
$3,484.32
*231 Petitioner's equipment, consisting of a wooden vault, desks, furniture, counters, filing cabinets and shelving, was old and outmoded and had no salvage value in 1952 or 1953. Some of the furniture and fixtures were purchased as far back as 1921. Petitioner has failed to show that respondent's disallowance of the amount of $3,805.22 in 1952 and the amount of $1,519.72 in 1953 as deductions for depreciation was erroneous. Petitioner had elected to maintain a reserve for bad debts. In its returns for the taxable years petitioner claimed as an addition to its bad debt reserve for the year 1952 the amount of $30,179.42, and the amount of $21,646.75 for the year 1953. Respondent allowed as a reasonable addition the amount of $28,672.94 in 1952 and $16,442.14 in 1953, and disallowed the amount of $1,506.48 in 1952 and $5,204.61 in 1953. Petitioner computed its claim for additions to its bad debt reserve for the taxable years 1952 and 1953 as follows: Reserve for bad debts January 1,
1952
$25,328.39
Addition to reserve in 1952
30,179.42
$55,507.81
Charges to reserve in 1952
27,325.86
Reserve - December 31, 1952
$28,181.95
Addition to reserve in 1953
21,646.75
$49,828.70
Charges to reserve in 1953
17,336.83
$32,491.87
*232 Petitioner's outstanding loan balance as of December 1, 1951, 1952, and 1953, was as follows: 1951
1952
1953
$2,796,473.38
$3,091,132.04
$3,249,186.80
Petitioner has failed to show that in disallowing a part of the addition to its reserve for bad debts in each of the taxable years 1952 and 1953, the respondent abused his discretion. Opinion EMIRE, Judge: Petitioner affirmatively alleges that in its income tax returns for the taxable years 1952 and 1953, it erroneously overstated its earned interest income by the respective amounts of $68,793.76 and $25,138.76. The only contention advanced by the respondent with respect to this issue is that petitioner has failed to offer competent evidence to establish the correct amount of earned interest income. At the hearing of this proceeding, petitioner through its treasurer, Paul H. Ross, offered in evidence a summary of its adjusted ledger entries which are set forth in detail in our findings of fact. In support of the ledger entries petitioner offered in evidence a detail summary made from its original loan cards. This detail summary for each of the taxable years sets forth the date of the loan, the name *233 of the borrower, the amount of interest charged, the term of the loan in months, the number of months remaining at the close of the year, and the unearned interest at the close of each year pertaining to each loan. Ross testified that the summaries were made from the original loan cards and were accurate. The summaries were received in evidence over the objection of counsel for the respondent on the ground that they were not the best evidence. No evidence of inaccuracy has been advanced by the respondent. In this posture of the record, we hold that petitioner has carried its burden of showing that it overstated the earned interest income reported on the corporation income tax returns for the years 1952 and 1953 in the respective amounts of $68,793.76 and $25,138.76 and have so found as a fact. The above holding renders it unnecessary to determine the second issue as to whether the so-called certificates of indebtedness qualify as borrowed capital within the meaning of section 439 of the 1939 Code. It appears that upon adjustment of the earned income as herein determined the excess profits tax credit allowed by the respondent exclusive of any consideration of the outstanding liability *234 on the so-called certificates of indebtedness as borrowed capital, is sufficient to eliminate any excess profits tax for each of the taxable years 1952 and 1953. The third issue relates to the propriety of the respondent's action in disallowing a part of the amounts claimed by petitioner as a deduction for depreciation in the taxable years 1952 and 1953. Petitioner claimed a depreciation deduction of $6,251.06 in 1952 and $3,484.32 in 1953. Respondent disallowed the amount of $3,805.22 in 1952 and $1,519.75 in 1953. The record consists of a schedule of assets which is incorporated in our findings of fact and contains the same information which is set forth in a schedule attached to the return for each taxable year in question. The schedule reveals that the acquisition date of one of the buildings is listed as 1924-1929, and the acquisition date of some of the furniture and equipment is given as "various." Petitioner's treasurer testified that some of the furniture and fixtures were acquired as far back as 1921, and was worthless and without salvage value. The useful life is stated to be 10 years, and it is obvious that some part was fully depreciated in prior years. In the absence *235 of a proper supporting schedule showing the acquisition dates, the useful life and the amount of depreciation taken in prior years, the categorical opinion expressed by the witness, Ross, that the amount of the claimed depreciation was reasonable, is of little evidential value. The burden is upon the petitioner to show the amount of a reasonable depreciation. Upon this meagre record it has not carried the burden. Therefore, the respondent's determination of the reasonable amount of depreciation allowable as a deduction is sustained. The final issue relates to the respondent's action in decreasing the amount of petitioner's addition to its reserve for bad debts in each of the taxable years 1952 and 1953. Petitioner claimed an addition to its reserve in the amount of $30,179.42 in 1952 and $21,646.75 in 1953. The respondent determined that the amount of $28,672.94 in 1952 and $16,442.14 in 1953 were reasonable additions. Petitioner contends that in reducing its addition to its bad debt reserve the respondent acted arbitrarily. Section 23(k)(1) of the 1939 Code allows, in the discretion of the Commissioner, a reasonable addition to the bad debt reserve. Petitioner has the heavy *236 burden of showing that the Commissioner's determination is arbitrary and an abuse of his discretion. One of the factors applied in determining whether the addition is reasonable is petitioner's prior record. Mill Factors Corp., 14 T.C. 1366, 1372. Although petitioner has been in business since 1917, this record is silent as to its prior experience. From the schedule in evidence, which is limited to the taxable years in question it appears that at the end of 1952, petitioner initiated a policy of maintaining a reserve of at least one per cent of its outstanding loans. Petitioner's reserve on January 1, 1952, amounted to $25,328.39. Charges to the reserve amounted to $27,325.86 in 1952 and $17,336.83 in 1953. While the outstanding loans increased considerably at the end of 1953, the charges in that year were only 63.4 per cent of the 1952 charges. In response to a question as to the reason for maintaining a larger reserve beginning with 1952, the witness, Ross, replied: "Well, after Regulation W was done away with, our loans were for a longer period. We didn't get as large a down payment as we had in the past, and I think probably we did take a little more risk than *237 we had previously. We feel the Bank Department - I think we should have at least a reserve of one percent. "In fact, one year, 1955, we depleted the entire reserve by almost $5,000, over." The function of a reserve for bad debts is not to protect against excessive losses in future recession years. In S. W. Coe & Co. v. Dallman, 216 Fed. (2d) 566, it is said: * * *
"From a viewpoint of sound business management it may be wise to accumulate surplus funds against future contingencies but such is not the type of reserve contemplated by section 23(k)(1), and is not allowable as a deduction for bad debt reserve. * * *" The respondent has allowed additions to the reserve of the amounts of $28,672.94 and $6,442.14 in the respective taxable years 1952 and 1953. These additions to the reserve balances at the beginning of 1952 and 1953 appear to be adequate. We hold upon this record that petitioner has not carried its burden of showing that the Commissioner has abused his discretion or acted arbitrarily in disallowing a part of the additions to the reserve for bad debts. Decision will be entered under Rule 50.